**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert Thomas BURKE, Defendant-Appellant.**

**No. 73–3320.**

United States Court of Appeals,
Ninth Circuit.

Nov. 11, 1974.

Certiorari Denied April 14, 1975.
See 95 S.Ct. 1576.

---

Nicholas R. Allis, Deputy Federal Public Defender (argued), Los Angeles, Cal., for defendant-appellant.

Darrell W. MacIntyre, Asst. U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

Before TRASK and SNEED, Circuit Judges, and POWELL,* District Judge.

## OPINION

TRASK, Circuit Judge:

Robert Burke appeals from his conviction of two bank robberies, proscribed by 18 U.S.C. § 2113(a), (d) (bank robbery; use of a dangerous weapon). Following trial by jury, the appellant was sentenced to two 20-year concurrent prison sentences.

A robber, wearing a stocking mask and armed with a revolver, robbed two banks on June 26, 1973, and July 16, 1973, respectively. During the first hold up the robber made his getaway in a stolen 1972 Plymouth Barracuda. This car was subsequently found nine blocks from the scene of the robbery. A search of the vehicle yielded green rubber gloves and a white towel with the designation "Steiner American Corporation." In the second robbery the getaway car was a 1967 Mustang reported stolen from Hessell Chevrolet on the date of the robbery. Mr. Jody Lilly, a salesman for Hessell Chevrolet, testified that the appellant was present on the car lot at noon of the previous day and that the keys to the Mustang were discovered missing at the end of the day. The appellant was arrested on August 28, 1973, while leaving his home in a 1973 Chevrolet van. The appellant's brother, the record owner of the van, gave the

FBI permission to search the van and informed the agents that they would find the appellant's pistol hidden in the van. A subsequent (warrantless) search yielded a .357 revolver and two .38 caliber revolvers and cartridges; each of the revolvers was wrapped in a white towel with the "Steiner American Corporation" designation. Other evidence linking the appellant with the commission of the crimes included: (1) identification testimony by witnesses at both banks and (2) photographs made by the surveillance cameras at each of the banks which revealed a tattoo on the robber's arm identical to that of the appellant. At the trial the appellant took the stand and testified that he had been at Hessell's Chevrolet on many occasions in connection with efforts to replace his wrecked car; the appellant further testified that he had a mustache since April 1973 (there was some confusion among the identification witnesses as to whether the robber had a mustache). The surveillance photographs showed a man who was clean shaven. On the basis of the foregoing evidence, the jury found the appellant guilty of both counts of the indictment.

At the close of the Government's case the appellant requested and received the statements of 13 witnesses in an FBI-conducted lineup. At the end of the trial defense counsel first discovered that one of these statements included a somewhat equivocal identification made by Sandra Alley, a government witness who positively identified the appellant at trial. Appellant argues that this transmittal of exculpating material violated both the Jencks Act, 18 U.S.C. § 3500, and the principles of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), because it was tardy.

Sandra Alley's lineup identification can fairly be designated a "statement" within the purview of 18 U.S.C. § 3500(e) [1] and one which related to the

---

* Honorable Charles L. Powell, Senior United States District Judge from the Eastern District of Washington, sitting by designation.

1. "The Act, in terms, is restricted to writings signed or adopted by a witness and to ac-

subject matter of the witness' in-court testimony as required by § 3500(b). As such, the statement could have been subject to the appellant's discovery following the witness' testimony on direct examination. However, the appellant fails to allege one crucial fact essential to a demonstration of a Jencks Act violation: namely, the fact that the defendant actually moved for a production of the statement as required by § 3500 (b).[2]

 In Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962), cert. denied, 376 U.S. 973, 84 S.Ct. 1137, 12 L.Ed.2d 86 (1964), this court discussed the "demand" requirements at length:

"Recognizing all of this, it remains true that the burden rests upon the defendant to invoke the statute at the appropriate time. The Act provides that the Court shall order the production of statements to which the defendant is entitled 'on motion of the defendant.' 'No ritual of words' is required, but the defendant must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry. If he fails to do so he may not assert, on appeal, that failure to order production or to undertake further inquiry was error. It would defeat the important purposes of the Act to give its provisions a hypertechnical interpretation. But it would be equally destructive to permit the statute to be used as a device for creating inadvertent error. The responsibility for fairly directing the attention of the Court to the precise demand submitted for the Court's determination is appropriately placed upon the Defendant, who seeks the statute's bene-

fits. 303 F.2d at 733 (footnotes omitted).

Here, apart from the appellant's general request for production of "Brady material" made at the beginning of the trial there does not appear to have been any specific request for a Jencks Act production of lineup statements, even though the appellant was aware that the lineup had occurred. Moreover, this case does not present an absolute refusal to produce materials. When the appellant renewed his request for "Brady materials" at the conclusion of the Government's case (and for the first time, made specific the demand for the line up statements), the material was turned over to the appellant. Since the Government's witness Sandra Alley was excused subject to recall and further cross-examination by the appellant there is no basis for the appellant's allegation that the witness was no longer available or susceptible to recall. The fact that the appellant's counsel failed to read the line up statement until after the trial cannot be deemed a prosecutorial error or abuse of discretion by the court. The appellant was given the statement at 10:45 on the morning of the second day of trial. There was a noon recess of 90 minutes, defendant called several witnesses in the final afternoon session, and he had the right to recall the witness in question. He had the time "reasonably required for the examination of such statement." 18 U.S.C. § 3500(c). Therefore, even assuming that a Jencks production request had been properly before the court, under these circumstances no violation of the statutory provisions occurred. See United States v. Amabile, 395 F.2d 47, 52 (7th Cir. 1968), vacated on other grounds, sub nom. Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); Moore v. United States, 394

---

counts which are 'a substantial verbatim recital' of a witness's oral statements. 18 U. S.C. § 3500(e); United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969)." Wilke v. United States, 422 F.2d 1298, 1299 (9th Cir. 1970).

2. Section 3500(b) reads in part:
" . . . the court shall, on motion of the defendant, order the United States to produce any statement . . .."

F.2d 818, 819 (5th Cir. 1968), cert. denied, 393 U.S. 1030, 89 S.Ct. 641, 21 L.Ed.2d 573 (1969) (counsel was given Jencks statement prior to lunch recess with right to recall witness after recess).

It is arguable whether Alley's line up statement constituted "exculpatory" evidence subject to the Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requirement of voluntary production by the prosecution. Her statement was:

". . . she could not be positive in her identification, she thought the number four individual [appellant] had a very similar build to the bandit that she observed. She added though, that the number two man who spoke in a very loud voice, sounded a little like the bandit."

In light of the witness' positive in-court identification of the appellant and the emphasis placed upon the appellant's distinctive New York accent, in the testimony of Mrs. Olivares, another witness, the witness' line up statement might have had considerable impeachment value. However, the materiality of this testimony to the question of the appellant's guilt is debatable. This was not a case in which the Government's case "depended almost entirely" on the identification testimony of Mrs. Alley (or Mrs. Olivares' voice identification) as was the situation in Giglio v. United States, 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (a more recent application of the *Brady* principle). Finally, even if the line up statement is considered *"Brady material,"* there was no absolute denial of the evidence to the appellant. As discussed previously, the appellant was given the evidence in ample time to examine it and had the privilege of recalling witness Alley to the stand for further cross-examination. We conclude that the appellant's *Brady* argument is without substantial merit.

Two agents from the FBI testified as experts with respect to photographic identification based upon pictures taken by the banks' surveillance cameras during the robberies. Agent Herold testified as a firearms examiner from the FBI laboratory in Washington, D. C. He stated that the weapon shown in the surveillance film had certain similarities with a weapon taken from the van and concluded that the weapons were both of the same type although it was not possible to determine if the gun taken from the van was the identical gun used in the robbery. No error was assigned on appeal to the admission of this testimony. Agent Webb testified to comparisons between photographs of appellant taken after arrest with surveillance photographs for the purpose of establishing a similarity of physical characteristics and wearing apparel. All photographs were enlarged to the same size. Agent Webb's testimony called attention to similarities between details appearing on the shoes of appellant and on the shoes shown in the surveillance photographs; similarities between a tattoo of a female figure on the appellant's arm with such a figure on a surveillance photo; and similarities of physical characteristics such as body build, structure of chin and nose. He concluded that "it would be very unlikely" that the person shown in the surveillance pictures would be any other than the person shown in the arrest photographs of appellant.

Appellant assigns as reversible error the court's ruling admitting the testimony of Agent Webb. This court has had two recent occasions to consider the question. In United States v. Brown, 501 F.2d 146 (9th Cir. 1974), we held that when a party seeks to introduce expert testimony on personal photographic identification he should first be required to make an offer of proof outside the presence of the jury. If the court on the showing made is convinced in its discretion that the expert may materially assist the jury beyond their common experience as amplified by argument of counsel, the expert should be allowed to testify *Brown*

was followed by a decision of the same panel on the same day in United States v. Trejo, 501 F.2d 138 (9th Cir. 1974), which also considered the admissibility of photographic identification. In line with *Brown* the court held that the admission of the testimony was error. We so find here. The similarities in construction and markings on the tennis shoes, the location and similarity of the tattoo on the two sets of photographs and the likeness of physical characteristics are all matters within the province and capability of the jury guided by argument of counsel on both sides. The error here, as in *Trejo* and *Brown*, however, was hardly prejudicial. Appellant was trapped by evidence of an overwhelming quantity both direct and circumstantial. The addition of Webb's testimony was but a small fraction of all that enmeshed appellant.

■ Appellant contends that a brief argument between the appellant and Government witness Agent Wilkins (provoked by the appellant) was overheard by a juror and thus prejudiced the appellant's right to a fair trial. The District Court investigated the incident and apparently concluded that any prejudice flowing from the event was minimal and that any interrogation of the jurors as to whether any of them had actually overheard the conversation would only serve to exacerbate an otherwise minor event. (The evidence that a juror had overheard the conversation was contradictory.) Under the circumstances, the District Court did not abuse its discretion in the handling of the episode.[3]

■ Appellant objects to the allusion at trial to the .38 revolvers discovered in appellant's van on the grounds that the evidence indicated that the robber used a .357 Magnum (also found in the van). Appellant contends that testimony regarding the .38 revolvers was therefore irrelevant and prejudicial. This court has recently approved of the admissi-

bility of a revolver over somewhat analogous objections of relevancy and prejudice raised in United States v. Walters, 477 F.2d 386, 388–89 (9th Cir. 1973), cert. denied, 414 U.S. 1007, 94 S.Ct. 386, 38 L.Ed.2d 245 (1974). There, evidence of the defendant's possession of a revolver was admitted even though none of the Government's witnesses was able to identify the gun as being used in the robbery. The court, however, held that notwithstanding the defendant's protestations of prejudice, the gun was probative of the defendant's *identity* as the perpetrator by demonstrating defendant's capacity to commit the offense. In the instant case it would appear that any need for "identity" evidence was satisfied by the introduction of the .357 Magnum alone about which there had been testimony linking it to the weapon used in the crimes, although arugably, allusion to the .38 revolvers bore some slight relevance to the question of criminal identity since the evidence was not conclusive that the .357 Magnum was the weapon used. However, once again, appellant challenges a matter within the sound discretion of the trial court; and under the circumstances, it cannot be said that the District Court clearly abused its discretion in allowing the jury to learn of the .38 revolvers.

Appellant challenges the legality of the search of his van following his arrest and argues that the court improperly denied his motion to suppress the evidence obtained as a result of that search. The Government counters that the appellant lacks standing to contest the search and that the search was otherwise justified.

■ The Government's contention that the appellant is without standing to protest the search of the van rests upon the fact that record ownership and licensing of the van was in the name of the appellant's brother. However, the appellant testified that the van was really his, and that ownership and registra-

---

3. The jury was explicitly instructed on the evidence to be considered in making its determination. R.T. at 390–91.

tion were in his brother's name only for the purpose of acquiring credit. The appellant also made an offer of proof to produce five witnesses who would verify the appellant's claim that the van was really his. The District Court declined this offer but also explicitly stated that it did not find the appellant's standing to be in issue. (R.T. at 35.) The court concluded that regardless of who owned the van, defendant used it extensively. (R.T. at 19.) The Supreme Court has stated:

> "[I]t is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical." Jones v. United States, 362 U.S. 257, 266, 80 S.Ct. 725, 733, 4 L.Ed.2d 697 (1960).

As a result of his repeated use of the van, the appellant had a reasonable expectation of privacy and freedom from search in the use of the van. *See* Katz v. United States, 389 U.S. 343, 88 S.Ct. 507, 19 L.Ed.2d 567 (1967). The situation here is analogous to that of the tenant's right to freedom from search. *See* Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). The District Court properly concluded that there were no standing obstacles involved in the instant case.

■ Under the principles of Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); and Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925), it is clear that certain "exigent circumstances" will justify a warrantless automobile search. Here, prior to the search, the appellant's

brother had informed the FBI that there was a long-barrelled pistol hidden in the van. The agents had probable cause to believe that weapons or other evidence of the crimes were hidden in the van. Owing to the movable nature of the van, the warrantless search was justified. Chambers v. Maroney, *supra*. *See* United States v. Cohn, 472 F.2d 290, 292 (9th Cir. 1973); Note, Warrantless Searches and Seizures of Automobiles, 87 Harv.L.Rev. 835, 842–45 (1974).

The judgment of the District Court is affirmed.